Date signed August 05, 2013




THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at GREENBELT**

| | |
|---|---|
| In Re:<br>Joseph F. Mona and Jean K. Mona<br>Debtors | Case No. 11-28112-TJC<br>Chapter 7 |
| Debra Stvan<br><br>Plaintiff<br>vs.<br>Joseph F. Mona and Jean K. Mona<br><br>Defendants | Adversary No. 11-00963 |

## AMENDED MEMORANDUM OF DECISION

Plaintiff Debra Stvan brings this action seeking to except from discharge loans she made to defendants Joseph and Jean Mona. The Court held a trial on the matter on April 23, 2013, and the parties have submitted post-trial briefs. For the reasons stated herein, the Court will except from discharge loans plaintiff made to Joseph Mona on December 10, 2008, and December 19, 2008, in the total amount of $100,000. The Court will dismiss the claims against Jean Mona.

Findings of Fact

Plaintiff Debra Stvan ("Plaintiff") holds a master's degree in elementary and special education from the University of Kansas and has worked for thirty years in special education. Currently, she is a special education teacher in Howard County, Maryland. Plaintiff's counsel describes her as "not a sophisticated investor" and "naïve" about investments, and these descriptions are accurate. She has never bought stock and has investment experience only through her 403(b) retirement plan provided by her employer.

Joseph F. Mona ("Mr. Mona") and Jean K. Mona ("Mrs. Mona") (collectively "Defendants") are married and reside in Maryland. Mr. Mona works as a contractor and developer and has done so since 1957 when he started his construction business.[1] Mrs. Mona handles all of the paperwork and typing for Mr. Mona's company. She also worked as an officer for several banks from 1968 to 1979. Mrs. Mona currently is the president of a networking group for M&T Bank.

*The Home Improvement Work.*

Plaintiff obtained a home equity line of credit of $250,000 that was available to remodel her house. Diana Murray, Plaintiff's assistant, recommended Mr. Mona for home improvement work. Plaintiff contacted Mr. Mona in October 2008 and during Mr. Mona's initial visit, Plaintiff showed him around the house to discuss other renovations that she would have done "in the ideal world." Trial Transcript at 11 (hereafter "Tr."). Plaintiff told him she had a budget of

[1] Mr. Mona's testimony as to the licenses he holds and when he obtained them was unclear and confusing. When initially asked if he was licensed he replied that he was not licensed by the Maryland Home Improvement Commission, but he was licensed as a general contractor. Defendants' exhibit 22 is a copy of Mr. Mona's home improvement license that expired on June 1, 2009. Mr. Mona stated that he acquired this license a week after he met Plaintiff. He later stated that he had a home improvement license since 2000, but that it was revoked at some point. Thus, the record is unclear as to what license Mr. Mona held and when it was valid.

$20,000 or $25,000. Mr. Mona generated a hand written contract that contained the scope of the work with a quote of $29,525.52. Pl.'s Ex. 3.

The work began in October 2008 and grew to become a much larger project that was not completed until August 2011. Plaintiff continued to add work to the project and even used Mr. Mona's workers for small maintenance jobs. During this time Mr. Mona oversaw the remodeling of the kitchen, guest bathroom, master bathroom, construction of a closet in the back bedroom and work on the floors, walls and garage of the house as well as landscaping. *See* Pl.'s Ex. 3 and Defs.' Exs. 8, 13, and 14–18 (containing the agreement of the original scope of work and requests for additional work that were made by e-mail). All work ultimately was completed in a workmanlike manner and Plaintiff was generally satisfied. During the project she recommended Mr. Mona to a neighbor for a home improvement project.

Neither party kept an accounting of the costs or labor as tasks were completed. Plaintiff did not receive invoices or cost updates for the extra work. A document dated March 1, 2009, provides construction and demolition costs for renovating Plaintiff's house in the amount of $73,140.31 and states that it was paid in full. Defs.' Ex. 7. Mr. Mona also produced an undated document that describes work performed after March 1, 2009 and purports to list items of work performed by Mona. Defs.' Ex. 8. Plaintiff testified that she never saw the document before, but that she paid around $94,000 for her home improvements. Tr. at 56.[2]

*The Bahamas Project and Plaintiff's Loan*s.

Although the work greatly expanded over time and Mr. Mona provided little in the way of estimates or contract updates, Plaintiff nevertheless was generally satisfied with the work. The real dispute between the parties stems from how the work was to be paid, and from

[2] At trial, Mr. Mona produced several self-serving documents of dubious origin.

Defendants' failure to repay loans made by Plaintiff for the purpose of property development on the island of Eleuthera, in the Bahamas.

Well before he met Plaintiff, Mr. Mona was contacted by Gareth Murray ("Murray") who asked if he was interested in becoming involved in a real estate project on Eleuthera. Murray is a Baptist minister and active in higher education for the state of Maryland. One of his parishioners married into the Bethel family, a family from Eleuthera that owns property on the island. Murray and Mr. Mona met with Rupert Bethel, a member of the Bethel family, and agreed to develop the land with him.

Murray and Mr. Mona formed Heron Bay, LLC ("Heron Bay"), and each holds a 50% interest in it. Heron Bay entered into an agreement with Rupert dated April 26, 2006, pursuant to which the parties agreed to form Bethel Enterprises Development ("Bethel Enterprises"), a Bahaman Company. According to the agreement, Rupert was "deemed to be in possession" of the Eleuthera land[3] and was "entitled to" the real property "subject to evidence to the contrary . . . . " Defs.' Ex. 5 at 1. Under the agreement, Heron Bay acquired a 40% interest in Bethel Enterprises and Rupert acquired 60%.

The agreement provided, among other things, that Heron Bay would provide the funding to allow Bethel Enterprises to quiet the title to the land. Specifically, according to a 2006 addendum to the agreement, Heron Bay is to provide money to Rupert Bethel both on a monthly basis and as parcels of land "successfully complete[] the 'quieting process,' or any other process necessary to render the property free of any encumbrances or challenges to title . . . . " Pl.'s Ex. 2. Once title was quieted, Heron Bay would be responsible for managing the construction work on the property. Defs.' Ex. 5. Murray testified he has invested about $10,000 in Heron Bay.

[3] There seems to be no dispute that the amount of the land in Eleuthera was 1087 acres, although the total amount of acreage contained in an addendum to the April 2006 agreement is not consistent with that amount. *See* Pl.'s Ex. 2 at 2.

Mr. Mona invested over $146,000 to the venture. Title has not yet been quieted and no development has occurred.

Around the end of October 2008, Mr. Mona asked Plaintiff how she was going to pay for the work on her home. She told him of the equity line of credit. Upon learning of the line of credit, Mr. Mona sought to induce Plaintiff to invest in Heron Bay. He told her about the Bahamas project and told her the venture contemplated starting a trade school on the property. He suggested that, given her background in education, she could run the school. Plaintiff became very interested in the project, both from an investment perspective and because of her potential involvement in the trade school.

Mr. Mona arranged for Plaintiff and Murray to meet, but he gave them different reasons for doing so. He told Plaintiff that she needed to meet Murray to become a partner in Heron Bay; he told Murray that he should meet Plaintiff because she was a teacher who was interested in managing the proposed trade school on Eleuthera. Mr. Mona never told Murray that Plaintiff was interested in becoming an investor in Heron Bay. Murray met with Plaintiff and Mr. Mona at her house in November for about 1½ to 2 hours. Murray gave her the same description of the project that he gives anyone when he talks about the venture, explaining that Heron Bay was in a partnership with a family that owned property on Eleuthera and wanted to develop the property with the family. He explained that the "only way to move [the venture] forward was if the title is quieted and that they were in the process of [quieting title]." Tr. at 100. Plaintiff had never heard of quieting title prior to this and thought it meant property needed to be surveyed.

Mr. Mona suggested to Plaintiff that she could pay for the remodeling by making him a loan at 15% interest and having the interest pay for the work while he paid her enough each month to pay the interest on her line of credit. These discussions led to two written proposals

that contained the terms Mr. Mona proposed. The core elements of the first proposal ("Proposal I") were that Mr. Mona and Murray would borrow $200,000 from Plaintiff at an interest rate of 15% to be paid within two years, for a total of $60,000 of interest. Pl.'s Ex. 1. Plaintiff would obtain the funds from her line of credit, paying the rate of 4.6%, for total interest of $18,400 over two years. Mr. Mona and Murray would pay Plaintiff the $18,400 in monthly payments over the two-year period, thus enabling Plaintiff to pay the interest on her line of credit. The $41,600 difference between the amount of interest Mr. Mona and Murray would be obligated to pay over two years on the loan ($60,000) and the amount Plaintiff was required to pay over two years on the line of credit ($18,400) would be used to pay for the improvements to Plaintiff's house. *Id.* Mr. Mona and Murray would provide a guaranty on the loan and Mr. Mona would provide a deed of trust on his residence in Accokeek, Maryland. Plaintiff was also to receive, among other things, three one week stays in Eleuthera once the residence was completed there, which was estimated to be in 2009 or 2010. *Id*.

Mona also presented to Plaintiff a second proposal ("Proposal II"). Under this proposal, Plaintiff would make a $200,000 loan essentially on the same basis as Proposal I, but as additional incentive, Plaintiff would receive a 1% membership interest in Heron Bay. Pl.'s Ex. 2. Plaintiff also would receive other "benefits" including:

- Ability to write off expenses for travel, home office, Eleuthera related expenses
- Income/commission from sales
- Use of facilities
- Employment in trade school

Pl.'s Ex. 2. Proposal II states that Heron Bay "consists of 1087 acres" and states "the appraised value as of June 2006 for high water view property is $288,000 per acre. " *Id*. Proposal II states

that Heron Bay consists of "1087 acres at $288,000" for a total value of $313,005,600.[4] *Id*. The proposal states the value of a one percent interest "over 20+ years = $3,130,056" based on the 2006 appraisal. *Id*. Mr. Mona provided Plaintiff with a copy of the appraisal to show her that she "was getting a steal." Tr. at 156. Proposal II was not signed by the parties. Mr. Mona did not tell Plaintiff of any risk of entering into the venture.

The parties disputed who prepared Proposal I and II. The Court finds that Mr. Mona or Mrs. Mona prepared Proposal I and II and that Mr. Mona was untruthful when he testified that Plaintiff prepared them and gave them to him. Among other reasons for this finding, Proposal I spells plaintiff's name as "StVan" rather than "Stvan" as Plaintiff spells it. Plaintiff would not have spelled her own name incorrectly. A number of documents that were unquestionably prepared by Defendants during this time period spell Plaintiff's name the same incorrect way: "StVan." Pl.'s Exs. 3 at 1, 4, 8, 12, 14; 4 at 1, 2; and 5 at 1; Defs.' Ex. 4. Moreover, by her own admission, Plaintiff did not have a sufficiently sophisticated understanding of financial matters to generate the transaction described in the proposals. Finally, the Court found Plaintiff to be significantly more credible than Mr. Mona.

The dispute over which party prepared the Proposals bears on the credibility of Mr. Mona and Plaintiff, since each testified that the other prepared them. However, the more probative value of the proposals is that they reflect the promises and misrepresentations being made by Mr. Mona to Plaintiff at the time, and this is true no matter which party prepared the documents.

In furtherance of the transaction, Mr. Mona presented Plaintiff with a document titled "third deed of trust." This document was prepared by Mrs. Mona, who found the form online and added the Defendants' names. The document states that it grants and conveys land in Prince

[4] A math error existed on the typewritten face of Proposal II in that the product of 1087 acres at $288,000 was shown to be $3,130,056. This error was circled and the correct product of $313,005,600 was handwritten on the document.

Georges County, Maryland as described in an attachment. Nothing was attached to the deed and the document was not completed. Mr. Mona showed Plaintiff an aerial view of his residence, which was the property that would serve as collateral on the loan, and told Plaintiff there was sufficient equity to serve as collateral. However, Mrs. Mona testified that she never intended to grant a deed of trust to Plaintiff and would not have agreed to do so, and she only prepared the deed of trust because Mr. Mona asked her. Tr. at 183. Defendants never provided Plaintiff with an executed deed of trust.

Mr. Mona never discussed the terms of Proposal I and II with Murray and did not ask Murray to join on the loan or provide Plaintiff with a guaranty. Murray would not have agreed to provide a personal guaranty to Plaintiff if asked. He testified that if anyone stated he agreed to provide a guaranty on a loan from Plaintiff, that statement would be false. Tr. at 98–99. Mr. Mona never discussed with Murray offering a membership interest in Heron Bay to Plaintiff or making her an officer or employing her. Murray did not know Plaintiff made a loan to Mr. Mona.

After discussing the venture with Mr. Mona, and after meeting Murray, Plaintiff issued a $50,000 check payable to Mr. Mona dated December 9, 2008, with the notation "loan/investment," Pl.'s Ex. 6 at 9, and was given a $50,000 promissory note signed by Defendants dated December 10, 2008. Pl.'s Ex. 4. Plaintiff issued two additional checks for a total of $50,000 payable to Mr. Mona on December 18, 2008, each with the notation "loan/investment," Pl.'s Ex. 6 at 10, 11, and was given a second promissory note signed by Defendants in the amount of $50,000 dated December 19, 2008. Pl.'s Ex. 4. The notes carried an annual interest rate of 15%.

When she made the loans, Plaintiff did not receive a guaranty from Murray, a deed of trust on Defendants' residence or a document showing she received an interest in Heron Bay. Plaintiff felt uncomfortable that the documents were not signed or notarized, but she was comforted by the promise of personal guaranties and that Mr. Mona's residence would serve as collateral.

On January 8, 2009, Plaintiff wrote another check payable to Mr. Mona for $50,000 with "loan/HI" written on it. She also wrote a check payable to Mr. Mona on January 29, 2009, for $35,000 with "loan" written on it. Pl.'s Ex. 6 at 12, 14. Plaintiff did not receive any promissory notes or other documents evidencing the $85,000 she advanced in January, and again did not receive Murray's guaranty, a deed of trust on Defendants' residence or an interest in Heron Bay.

The parties do not dispute that the $100,000 advanced by Plaintiff in December 2008 was a loan. Plaintiff contends the $85,000 that she gave Mr. Mona in January 2009 also was a loan, while Defendants contend these funds were payments for the home improvement work. The Court finds that these funds were a loan. The checks Plaintiff gave that comprise the $185,000 in December 2008 and January 2009 all carry the notation "loan." *Id*. at 9, 10, 11, 12, 14.[5] Further, the checks were given in accordance with the understanding Plaintiff had with Mr. Mona that was reflected in the Proposals. Finally, it is simply not credible to suggest, as Mr. Mona does, that Plaintiff was prepaying $85,000 in January 2009 for work that was neither proposed nor known and for which no estimates were given.

Defendants paid Plaintiff an interest check of $3,750 on December 20, 2008, and another $3,750 the next year. Pl.'s Ex. 4 at 3. A third check for interest of $1,200 was given to Plaintiff on September 25, 2010. Defs.' Ex. 4. No other interest payments were made.

[5] In contrast, during this same period, Plaintiff wrote a number of checks to Mr. Mona to pay for home improvement work. *See* Pl.'s Ex. 6. Those checks carried the notation "home improvement" or similar reference. *Id*.

Beginning in January 2009, the parties had a number of meetings about the venture with Defendants, Murray and Judy Goodman, another investor. Plaintiff met Mrs. Mona for the first time at one of these meetings. The discussion at the meetings included the potential trade school and an existing school it could be modeled after, and ways to promote the venture. Mr. Mona wanted to have offices set up throughout Maryland and convinced Plaintiff to convert her back bedroom into an office with a beach theme to promote the venture. The offices would be used for what Mr. Mona called a "fly and buy" wherein interested investors would be provided information in the office and then flown down to see the development. Mr. Mona told Plaintiff she could make money from the commissions from sales of the property.

The group also discussed the title issues involving the land, and the delay. From these discussions, Plaintiff understood that the Bethel brothers' mother had given ownership of the land to the younger brother because he had more business sense. As time passed Plaintiff learned that the venture would take longer to develop than first anticipated, and later learned that problems had developed between Rupert Bethel and his brother that were being addressed in the Bahaman court system.

Plaintiff began to feel uneasy about the loans for a number of reasons, including that interest payments were not being made. In September 29, 2009, Plaintiff sent an e-mail to Mr. Mona stating that she never received documentation reflecting that Plaintiff gave Mr. Mona the two checks for $85,000 and that she "felt uncomfortable" and "would like to discuss the loan being paid back" in December of 2009. Defs.' Ex. 9. Plaintiff did not receive an e-mail response.

At trial, Defendants presented a memo dated September 30, 2009, Defs.' Ex. 10, as their response to Plaintiff's September 29 e-mail. Mrs. Mona testified she typed Defendants' exhibit

10 and printed the document rather than corresponding through e-mail with Plaintiff as she otherwise did because their internet service happened to be nonworking at the time she typed the document. Mr. Mona testified that he delivered this memo to Plaintiff, but wasn't sure when he did so. Plaintiff testified she never received it and did not recognize it.

The memo states that Plaintiff's September 29, 2009, e-mail is incorrect and that interest is only due on $100,000 and the remaining funds should be considered payment for the remodeling and that extra work done will be either due and owing or credited as payment on the interest due on the loan. Defs.' Ex. 10. The memo concludes by stating that Defendants' "hands are tied until the properties in the Bahamas obtain clear (quieted) title." *Id.* Although the Court questions the veracity of the September 30 memo,[6] it is of little probative value in that it is a self-serving document in which Defendants purport to describe transactions that occurred nine months earlier. It was made, according to Defendants, when they could not repay the loans and therefore had a strong incentive to recharacterize the transactions.

Defendants made no further payments on the loans.

Defendants filed a petition for relief under chapter 7 on September 7, 2011. This action followed.

## Conclusions of Law

"The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only

[6] Defendants' exhibit 10 is another document produced by Defendants of dubious origins. Although the parties generally corresponded by e-mail, according to Defendants it so happened that their e-mail was not working when they wanted to respond to Plaintiff. Mrs. Mona testified she typed Defendants' exhibit 10 and "gave it to Joe and asked him to take it over to [Plaintiff]." Tr. at 185. She specifically testified that "she type[d] it, fold[ed] it up and g[a]ve it to him, [and then] it's out of my mind." *Id.* Neither Defendant testified that Mr. Mona signed the original and kept a copy, and their testimony does not account for the fact that the copy of the document produced at trial has Mr. Mona's signature on it. Mr. Mona could not recall when he delivered the document to Plaintiff and none of his time entries reflect a meeting with Plaintiff on or about September 30, 2009. Furthermore, Plaintiff's testimony that she was not given the document was credible.

to an honest but unfortunate debtor." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998). This policy is codified in §523 which provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
> ***
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. §523(a)(2)(A). While exceptions to discharge are narrowly interpreted to protect the purpose of providing debtors a fresh start, it is equally important to ensure that "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999).

To establish a claim under §523(a)(2)(A), a plaintiff must prove (1) a false representation; (2) knowledge that the representation was false; (3) intent to deceive; (4) justifiable reliance on the representation; and (5) proximate cause of damages.[7] *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 218 (4th Cir. 2007); *accord*, *Guaranty Residential Lending, Inc. v. Koep* (*In re Koep*), 334 B.R. 364, 371–72 (Bankr. D. Md. 2005).

These elements have been well developed in the case law. "A misrepresentation can be any words or conduct which produce a false or misleading impression of fact in the mind of another." *Koep*, 334 B.R. at 372 (citing *Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 897 (Bankr. E.D. Va. 1999)). A "misrepresentation may be implied by silence." *Household Fin. Corp. v. Kahler* (*In re Kahler*), 187 B.R. 508, 512 (Bankr. E.D. Va. 1995). "An omission may

[7] A plaintiff must prove all the elements of §523(a)(2) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

constitute a misrepresentation where the circumstances are such that the omission creates a false impression which is known by the debtor." *Ultra Litho, PYT, Ltd. v. Moore* (*In re Moore*), 365 B.R. 589, 602 (Bankr. D. Md. 2007). A misrepresentation may exist notwithstanding the fact that the debtor did not "affirmatively state a misrepresentation or was never asked to disclose pertinent facts." *Kahler*, 187 B.R. at 512.

The misrepresentation must be made with intent to deceive.[8] An "intent to deceive may be inferred by the circumstances, including whether the defendant knowingly or recklessly made false representations, which she should know would induce the plaintiff to rely on them." *Koep*, 334 B.R. at 372; *see also*, *Kahler*, 187 B.R. at 513 (finding that "Because direct proof of fraudulent intent is almost impossible to produce, fraudulent intent can be inferred from circumstantial evidence . . . . [W]here a person recklessly makes false representations that the person knows or should know will induce another to rely on it, intent to deceive may logically be inferred.") (internal citations omitted)).

Plaintiff also must show that harm resulted as a proximate cause of the misrepresentation. "It is axiomatic that in the context of a claim for exception to discharge under Section 523(a)(2)(A), the harm or damage is the provision of credit." *Biondo*, 180 F.3d at 135.

Finally, Plaintiff must show that she relied on the misrepresentation. In *Field v. Mans*, 516 U.S. 59 (1995), the United States Supreme Court held that a plaintiff must show justifiable reliance rather than reasonable reliance to prevail under §523(a)(2)(A). Justifiable reliance does not mean that the plaintiff's "conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of

[8] The intent to deceive is akin to the intent to induce to act, the second required element of fraudulent misrepresentation. *Biondo*, 180 F.3d at 134. Mona admitted he intended to induce Plaintiff to invest in Heron Bay. Tr. at 164.

conduct to all cases." *Id.* at 71 (quoting Restatement (Second) of Torts (1976) §545A, Comment b). "[A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." *Id.* at 70 (internal quotation marks omitted). "[T]he plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation cannot offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Id.* at 72 (quoting 1 F. Harper & F. James, Law of Torts §7.12, pp. 581-583 (1956)). Nonetheless, a plaintiff is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (quoting Restatement (Second) of Torts (1976) §541, comment a).

The Court will turn to these elements, first as to Mr. Mona and then as to Mrs. Mona.

*Joseph Mona*

Once Mr. Mona learned of the substantial line of credit available to Plaintiff, he sought to obtain those funds through deliberate misleading and deceptive statements, misrepresentations and false promises. The actionable, but by no means only, misrepresentations and false promises made by Mr. Mona are the following:

- Mr. Mona told Plaintiff that Murray would be a co-borrower or guarantor on the loans. In fact, Mr. Mona never discussed with Murray having Murray provide Plaintiff a guaranty, and Murray would not have agreed to do so. Murray testified that any statement that he would provide a guaranty to Plaintiff was false. Tr. at

98–99. Mr. Mona never intended to have Murray provide a guaranty or sign on the loans.

- Mr. Mona told Plaintiff he would provide her with a deed of trust on his and Mrs. Mona's residence. In fact, Mr. Mona never asked Mrs. Mona to join on a deed of trust and Mrs. Mona testified she never would have agreed to provide a deed of trust. Tr. at 183. Mr. Mona never intended to give Plaintiff a deed of trust.
- Mr. Mona told Plaintiff she would become a 1% partner in Heron Bay. In fact, Mr. Mona never discussed with Murray, the other 50% interest holder in Heron Bay, having Plaintiff receive a 1% interest. There was, and is, no obstacle to giving Plaintiff a 1% interest, and Mr. Mona has not done so. Mr. Mona never intended to give Plaintiff an interest in Heron Bay.

Mr. Mona's intent was clear. He wanted to induce Plaintiff into providing him with funds while giving her as little protection as he could. Although he promised her a guaranty by Murray, a deed of trust on his residence, and myriad benefits from the Eleuthera project, in fact he gave her nothing other than unsecured promissory notes for the first $100,000 she loaned him in December, 2008, and not even that for the $85,000 she loaned him in January, 2009. As a result of Mr. Mona's action, Plaintiff is left holding loans from Defendants that they cannot pay without the promised deed of trust or any recourse to Murray. She holds no interest in the Eleuthera project and no ability to realize any value from the project if title is quieted.

Mr. Mona made other misrepresentations or misleading statements to Plaintiff which independently do not provide a basis for a §523(a)(2)(A) action, but which were consistent with his deceptive intentions:

- Mr. Mona told Plaintiff she needed to meet Murray so that she could become a partner in Heron Bay. Mr. Mona told Murray that the purpose for meeting Plaintiff was only that Plaintiff was a teacher who was interested in running the trade school when it opened.
- Mr. Mona admits he wanted to induce Plaintiff into investing in Heron Bay. Yet it appears from the record that Mr. Mona kept from Plaintiff the agreement between Rupert Bethel and Heron Bay dated April 26, 2006. Defs.' Ex. 5. The agreement is the core document between the parties that explains Heron Bay's rights and obligations, the quiet title process, and the ownership of the 1087 acres.
- Mr. Mona told Plaintiff she could make commissions on sales from the Eleuthera development and convinced her to convert a room in her house to a sales office, in the process generating more construction work for himself. In fact, Mr. Mona never discussed with Murray having a sales office in Plaintiff's home or having her be involved in sales. No sales office was ever opened, no sales efforts have occurred.

Mr. Mona also was deceptive in his description of the Eleuthera project, including misrepresenting Heron Bay's assets and concealing the risk associated with the project:

- Mr. Mona told Plaintiff, as reflected on Proposal II, that "Heron Bay consists of 1087 acres." Pl.'s Ex. 2. In fact, Heron Bay only owns a 40% interest in Bethel Enterprises, which owns the real property. Thus, Heron Bay never owned any real estate at all, and only owned 40% of an entity that purportedly held the real estate.

- Mr. Mona intentionally concealed the quiet title risks of the Eleuthera property from Plaintiff until well after he received her funds. The risks were considerable: four and one-half years after Plaintiff made the loans, title has not yet been quieted.

While these Eleuthera misrepresentations were material, their harm was mitigated because Murray explained the Eleuthera project to Plaintiff when they met in November 2008, before she made the loans. He told her that the land was owned by Bethel and that Heron Bay only owned a 40% interest in the project. He also explained the quiet title risk to Plaintiff the same way he explains it to anyone who asks about the project. Thus, Plaintiff was advised of the facts and risks of the Eleuthera project by Murray before she made the loans. She may not have fully appreciated the risks, but that made the loan protections Mr. Mona promised her all the more important.

There is no doubt that Plaintiff relied on Mr. Mona's promise to provide a deed of trust, Murray's guaranty, or interest in Heron Bay when she gave him the funds. Her reliance was justified, at least with respect to the December 9 and December 18 loans totaling $100,000. While it is true that Plaintiff advanced the funds without requiring a contemporaneous receipt of Murray's guaranty or the deed of trust on Defendants' residence, Plaintiff trusted Mr. Mona to provide those protections. She also anticipated receiving an interest in Heron Bay. Plaintiff lacks sophistication in financial matters and was justified in advancing the funds on the expectation that Mr. Mona would provide her these protections and benefits after the loans were made. She was entitled to rely on Mr. Mona's representations and promises without checking with Murray to determine his willingness to provide a guaranty, or with Mrs. Mona to determine her willingness to execute a deed of trust. "[A] defendant who has been guilty of conscious

misrepresentation cannot offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Mans*, 516 U.S. at 72 (quoting 1 F. Harper & F. James, Law of Torts §7.12, pp. 581-583 (1956)).

The Court reaches a different conclusion with respect to the $85,000 that Plaintiff advanced by checks dated January 8 and 29, 2009, which was at least a month after she made the first $50,000 loan on December 9. During that month, Mr. Mona did not provide Plaintiff with a deed of trust on his residence or Murray's guaranty, and he did not give her an interest in Heron Bay. There is nothing in the record that establishes that Mr. Mona made additional promises or misrepresentations during that 30 day or so period that would have made Plaintiff believe these protections and benefits were forthcoming.

While Plaintiff does not have substantial experience with investments, she is not quite as naïve as she is made out to be. She owns a home with an equity line of credit and has a general understanding of deeds of trust. She certainly knew that she had not received a deed of trust on Mr. Mona's residence or a guaranty by Murray after she made the December 2008 loans, and therefore knew that she did not have those protections. Yet she did not make any further request for these protections before she lent Mr. Mona the additional $85,000. She also knew that she did not receive any document showing she held an interest in Heron Bay, but made no further request for that interest before she advanced the second round of funds. It was one thing for her to lend the initial $100,000 on the belief that these protections and benefits would be forthcoming; it was another to lend an additional $85,000 thirty days after she had not received them. Plaintiff was "required to use [her] senses, and cannot recover if [she] blindly relies upon a misrepresentation" that she could have determined to be false if she used her opportunity to

make a cursory examination or investigation. *Mans*, 516 U.S. at 71 (quoting Restatement (Second) of Torts (1976) §541, comment a).

Finally, Mr. Mona argues that neither of the Proposals was signed by either party, and therefore there was no agreement between the parties on the terms of the loans. He contends that the only written documents - the promissory notes - establish that Plaintiff simply made the Defendants an unsecured loan which they are now unable to repay. This Court disagrees.

There is no requirement in §523(a)(2)(A) that a document containing a misrepresentation must be signed by the party making the misrepresentation.[9] The evidence established that Mr. Mona made misrepresentations and false promises to Plaintiff in order to induce her to advance funds, and which, in fact, induced her to advance funds. Mr. Mona made these misrepresentations orally and in writing in the Proposals. As Plaintiff testified, what turns a proposal into an agreement is a "Handshake, verbal agreement. Trust." Tr. at 61. There is no need for a signed agreement.

*Jean Mona*

Plaintiff did not carry her burden of establishing that Mrs. Mona joined in the misrepresentations made by Mr. Mona, or that she was sufficiently complicit with him so that her obligation to Plaintiff under the notes should be excepted from discharge under §523(a)(2)(A). Plaintiff never met Mrs. Mona before she advanced the funds in December 2008 and January 2009, and never discussed with her the terms of the Proposals or the loans. Plaintiff

---

[9] Section 523(a)(2)(A) stands in contrast to §523(a)(2)(B), which requires that a materially false statement concerning a debtor's financial condition must be in writing to be actionable. *See Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir. 1984) (citing *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir. 1983) (statement concerning a debtor's financial condition must be in writing to be excepted from discharge)). Therefore, Mr. Mona's oral statement to Plaintiff that he had substantial equity in his residence, if false, would not state a claim under §523(a)(2) unless it was made in writing. *Id*. But Mr. Mona made many misrepresentations, described above, that do not concern Mr. Mona's financial condition, and therefore were not required to be in writing to be actionable under §523(a)(2)(A). The fact that these statements are also contained in the written proposals corroborates Plaintiff's testimony that Mr. Mona made these misrepresentations and false promises.

made the checks payable only to Mr. Mona. As Mrs. Mona testified, she does not own an interest in Heron Bay. There was no evidence that Mrs. Mona benefitted from the loans, except to the extent she may have benefitted indirectly because the funds were advanced to her husband. Mrs. Mona's primary role at the time Plaintiff made the loans was typing documents for Mr. Mona and managing the paperwork. Accordingly, the Court will dismiss the claims against Mrs. Mona.

Conclusion

For the foregoing reasons, the Court will except from discharge loans Plaintiff made to Mr. Mona on December 10, 2008, and December 19, 2008, in the total amount of $100,000, plus accrued interest and any appropriate costs or charges. The Court will dismiss the claims against Mrs. Mona.

cc: Plaintiff
Plaintiff's counsel
Defendants
Defendants' counsel
Trustee
United States Trustee

End of Memorandum